# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

KATHLEEN BRIORDY,          )
                                          )

         **Plaintiff,**           )
                                          )

    **v.**                           )         **Case No. 3:07-0295**
                                          )         **Judge Echols**

**CHLOE FOODS CORPORATION and**  )
**STEVE STACHLER, individually,**    )
                                          )

         **Defendants.**        )

## MEMORANDUM

      Plaintiff Kathleen Briordy accuses her former employer, Defendant Chloe Foods, of sexual harassment and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e *et seq.* and the Tennessee Human Rights Act ("THRA"), T. C. A. § 4-21-101, *et seq.*  Plaintiff also brings claims under Tennessee common law against Chloe Foods claiming it is vicariously liable for assault, battery, the negligent infliction of emotional distress and intentional infliction of emotional distress/outrageous conduct.  Plaintiff also sues Steve Stachler ("Stachler"), her former supervisor, for  retaliation and aiding and abetting retaliation in violation of the THRA, the negligent infliction of emotional distress, intentional infliction of emotional distress/outrageous conduct, and assault and battery.  Both Defendants have filed Motions for Summary Judgment (Docket Entry Nos. 29 & 33), to which Plaintiff has responded in opposition and Defendants have replied.

## I.  RELEVANT FACTS

      Because Defendants are moving for summary judgment, all facts and the inferences to be drawn therefrom must be construed in Plaintiff's favor.  So construed, the relevant facts are as follows.

      Chloe Foods is a manufacturer and distributor of food products operating out of Brooklyn, New York.  Plaintiff was hired by Chloe Foods on March 27, 2006 and terminated on May 30, 2006. Shortly after being hired, Plaintiff attended three to four days of training at Chloe Foods' corporate

office in Brooklyn. That training did not include any instructions about sexual harassment, or otherwise instruct her on how or to whom to report alleged instances of sexual harassment. Plaintiff did not receive a copy of Chloe Foods' Employee Handbook containing its sexual harassment policy at this training session or any time thereafter.[1]

Plaintiff was initially hired as a Regional/National Account Manager, with her job being to get Chloe Foods appointments with decision makers at national, multi-chain restaurants so that Chloe Foods could pitch its goods. A few weeks into her employment, Plaintiff's duties were shifted to developing broker distribution networks in a specific geographic location.

Throughout her short tenure with Chloe Foods, Plaintiff's direct supervisor was National Food Service Manager Steve Stachler ("Stachler").[2] As Plaintiff's direct supervisor, Stachler was responsible for training Plaintiff. Stachler worked from his home in Atlanta, Georgia, while Plaintiff worked from her home in Nashville, Tennessee.

At the core of Plaintiff's allegations in this case is her assertion that during her employment with Chloe Foods, Stachler engaged in "a pattern and practice of sexual harassment." This took the form of repeated inappropriate comments and innuendos and culminated in offensive touching during a business trip.

During Plaintiff's very first telephone conversation with Stachler, Stachler invited Plaintiff to his home in Atlanta for the weekend, ostensibly so that the two of them could get to know each other better before their first business trip to Louisville, Kentucky the following week. Around the same time as the invitation to his home, Stachler e-mailed a picture of himself standing next to his Porsche to Plaintiff and then called her to see what she thought of the picture. Plaintiff found

---

[1]In fact, Plaintiff claims there was no written sexual harassment policy when she was employed by Chloe Foods and the only such policy produced by Defendant in this litigation is dated January 2007, after Plaintiff's termination from employment.

[2]Stachler admits he received a copy of Chloe Foods' Employee Handbook during his employment and read the policies contained therein.

2

Stachler's invitation to his home in Atlanta to be shocking and inappropriate behavior, and she told him she thought the invitation inappropriate, saying she would see him the following week. Plaintiff did not report these incidents to anyone at Defendant Chloe Foods because, as a new employee who had just started work, she wanted to stop the inappropriate behavior herself and get off to a good start with the company. She was afraid she would lose her job if she reported Stachler's conduct.

Plaintiff and Stachler took two business trips to Louisville during Plaintiff's short term of employment with Chloe Foods. When Stachler arrived at Plaintiff's home to leave for their first business trip to Louisville he said, "So am I as good looking as my picture?" Plaintiff found this question to be offensive because she did not "think whether someone is good looking or not is appropriate for business." (Pf. Depo. at 34). Plaintiff did not tell Stachler she found this statement offensive (or anyone else at Chloe Foods) and decided instead that it would be best to let the comment pass.

While driving along Interstate 65 towards Louisville on their first business trip together, Stachler asked if Plaintiff would like to stop at an adult book store which was on the way. He also asked her what kind of sex toys she liked. Plaintiff told Stachler she didn't think the suggestion to stop at an adult book store was appropriate and what adult toys she may have liked was none of his business. Plaintiff claims Stachler told her what he thought was waiting for her in the store, and tried to explain why it would be advantageous for her to go into an adult toy store.

Plaintiff claims that shortly after this initial rebuff of Stachler's advances, her job duties were changed. She claims she was moved from attempting to secure restaurant accounts to managing broker networks, which was an entirely different sort of work requiring her to target a different group of people. Chloe Foods claims that this was merely an expansion of Plaintiff's job duties because she had been unable to set up chain restaurant appointments.

During the second trip to Louisville, after Stachler and Plaintiff met with a broker, the two went to a nearby casino. Stachler told Plaintiff he would take Plaintiff to the casino for dinner, but

3

instead they had a snack. At the casino, Plaintiff had two glasses of wine and Stachler had at least five drinks of hard liquor.[3] While Chloe Foods has no written policy regarding drinking alcohol or gambling while on business trips, it does not condone excessive drinking by its employees while on business trips.

At the casino, Stachler grabbed Ms. Briordy around her waist and pulled her into him. He then held her around her waist, and tried to kiss her. Plaintiff refused the advance by moving her face and pushing Stachler away. Plaintiff asked to return to the hotel, but Stachler refused and continued to gamble. Later in the evening when Stachler dropped a pen near a slot machine, Plaintiff bent over to pick up the pen. Stachler also bent over, grabbed Plaintiff around the waist and kissed her. Plaintiff told Stachler to "stop it" and said "I really want to go back to the hotel. It's time. It's time to go back." At some other point in the evening, Stachler again tried to kiss Plaintiff although the record is unclear as to when. In any event, shortly after the pen dropping incident, Stachler and Plaintiff left the casino and returned to their hotel.

Plaintiff did not report the casino incidents to Chloe Foods' management or Human Resources Department. Plaintiff claims, however, she did not report the incident because she was terminated from employment shortly thereafter. Plaintiff also claims she was hindered in reporting Stachler's harassment because, after contacting Ron Loeb ("Loeb"), Chloe Foods' Sales Manager and Stachler's immediate supervisor, regarding a territory change earlier, Stachler ordered her not to speak with anyone in the company other than him for any purpose. Because of that directive, Plaintiff feared losing her job if she disobeyed her supervisor's order by reporting his conduct.

During one or both trips to Louisville, Stachler told Plaintiff "I would be happy to come to your room if I were invited." Plaintiff told Stachler he was not invited to her room and that she did

_____

[3]In fact, Stachler became so impaired from drinking that Plaintiff drove back to the hotel.

4

not think it was a good idea. Plaintiff told Jessica Plumitallo[4] ("Plumitallo"), a newly hired Sales Representative in New York City  (whom Plaintiff had met during training), about the solicitation. Plaintiff felt comfortable telling her fellow representative rather than Human Resources because the revelation to a co-worker  would not jeopardize her job.

In addition to these specific incidents, Plaintiff claims Stachler repeatedly made sexually suggestive remarks to her.  While she could not recall in her deposition the details of each and every offensive comment, she claims Stachler "was constantly aggressive about him having a sexual relationship with [me]." (Pf. Depo. at 43).  When pressed for further specifics, Plaintiff testified as follows:

> Q Could you please describe each of these comments for me, please?
> A No, I can't. I can't describe the verbatim, but he was constantly aggressive about him having a sexual relationship with me.
>                *        *        *
> Q So you don't recall any specifics?
> A I do recall that on a number of occasions he would say, Well, I can be there- I can be there in a minute. Or, gee, why don't we meet somewhere? Or I can recall all of those that were interjected into the conversations that I would have with him as I'm reporting business transactions and schedules, that he was constantly making himself available to me and wanting to meet with me.

(Pf. Depo. at 43-44).

According to Plaintiff, whatever ambivalency could be found in Stachler's comments, it was clear to her that his statements were suggestive and geared towards her having a sexual relationship with him, such as when he said, "Hey, baby, I can be there for you any time you want" or "C'mon baby, you know, I'm pretty good." (Pf. Depo. at 44 & 46).  While Plaintiff told Plumitallo about the repeated remarks, she did not report them to management.  She does not know if Plumitallo further reported the comments to anyone at Chloe Foods.

Plaintiff contends that she was terminated because of her refusal to accept the sexual advances and inappropriate conduct of Stachler.  Her termination on May 30, 2006 came just three

---

[4]Plaintiff initially identified this person as Pam, but claims that the actual person she spoke with was Plumitallo.

days after she told Stachler "we need to maintain a business relationship for the betterment of the company and for both of us."  (Pf. Depo. at 72).

Chloe Foods claims that Plaintiff's termination was based purely on her poor job performance.  Specifically, Chloe Foods claims Plaintiff was terminated because she was unable to set up appointments with a multi-unit chain restaurant, even though she had represented during her hiring interview that she had such contacts in the restaurant industry.

Jeffrey Siegel ("Siegel"), the President of Chloe Foods, claims he was the sole decision maker regarding Plaintiff's termination, even though Stachler was the one who informed her of the termination.  While Siegel so testified in his deposition, the evidentiary record is not so clear.  In his deposition, Stachler claimed that on the Friday of Plaintiff's termination he was involved in at least three phone calls with Siegel, Loeb and perhaps others.  During the course of those calls there were discussions about what should be done with Plaintiff, such as whether she would remain with the company and, if not, what they should do in light of her termination.   Moreover, Siegel did not monitor Plaintiff's performance on a daily basis, but instead consulted with others in the company, such as Loeb, with whom he often rode to work.[5]  Prior to her termination, no formal evaluation was done of Plaintiff's work, nor was she told that her job was in jeopardy due to poor performance.

As a result of the alleged hostile work environment created by Stachler, Plaintiff claims that she was humiliated, intimidated and suffered emotional distress.  Plaintiff claims that she has suffered sleep loss, nightmares and insomnia as a result of her alleged treatment by Stachler.  However, she has not sought medical treatment for any emotional distress resulting from her employment with Chloe Foods.

---

[5]In response to Chloe Foods' statement of facts, Plaintiff claims that Stachler personally told Siegel he should fire Plaintiff and cites for that Stachler's testimony on page 84 of his deposition.  That is a mischaracterization.  What Stachler actually testified to was that he was *told by* Siegel that Plaintiff should be fired and that he himself never told anyone Plaintiff should be fired.

6

## II.  STANDARD OF REVIEW

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c); Covington v. Knox County School Sys., 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met.  See Martin v. Kelley, 803 F.2d 236, 239 n.4 (6th Cir. 1986).  The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed.  See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); Covington, 205 F.3d at 914 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)).  If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial.  If the party does not so respond, summary judgment will be entered if appropriate.  Fed. R. Civ. P. 56(e).  The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case.  Celotex, 477 U.S. at 325.  A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248.  In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## III.  CHLOE FOODS' MOTION FOR SUMMARY JUDGMENT

### A.  Statutory Claims

Plaintiff sues Chloe Foods claiming it is liable for a hostile work environment and retaliation under both Title VII and the THRA.  The same basic analytical framework is used in evaluating claims under both statutes. Campbell v. Florida Steel Corp., 919 S.W.2d 26, 31-32 (Tenn. 1996); Gee-Thomas v. Cingular Wireless, 324 F.Supp.2d 875, 881 (M.D. Tenn. 2004).

7

### 1. **Hostile Work Environment**

Title VII of the Civil Rights Act of 1964 makes it an unlawful employment practice for a covered employer "to discriminate against any individual with respect to h[er] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . .".  42 U.S.C. § 2000e-2(a)(1).  "The phrase 'terms, conditions, or privileges of employment' . . . includes requiring people to work in a discriminatorily hostile or abusive environment."  Harris v. Forklift Sys., Inc., 510 U.S. 17, 20, 114 S.Ct. 367 (1993).

"In order to establish a hostile work environment claim, an employee must show the following: 1) the employee is a member of a protected class, 2) the employee was subject to unwelcomed sexual harassment, 3) the harassment was based on the employee's sex, 4) the harassment created a hostile work environment; and 5) the employer failed to take reasonable care to prevent and correct any sexually harassing behavior."  Bowman v. Shawnee State Univ., 220 F.3d 456, 463 (6th Cir. 2000).  Chloe Foods moves for summary judgment on this claim solely on the basis that Plaintiff has failed to show the alleged harassment created a "hostile work environment" as that phrase has been described by the courts.  While the question is close, a fair reading of the record with the inferences construed in Plaintiff's favor shows Plaintiff has presented sufficient evidence to preclude the entry of summary judgment on her hostile work environment claim.

A hostile work environment arises "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  Harris, supra 510 U.S. at 21. Hence, "not all workplace conduct that has sexual overtones can be characterized as harassment and forbidden by statute."  Black v. Zaring Homes, Inc., 104 F.3d 822, 825 (6th Cir. 1997).  Instead, "[t]he concept of sexual harassment is designed to protect working women from the kind of male attentions that can make the workplace hellish for women."  Bakersville v, Culligan Intern. Co., 50 F.3d 428, 430 (7th Cir. 1995).

To determine whether workplace harassment is sufficiently severe or pervasive, the Court is to consider the "totality of the circumstances." Williams v. General Motors, 187 F.3d 553, 562 (6th Cir. 1999). The Court is also required to utilize both an objective and subjective test: "the conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive and the victim must subjectively regard the environment as abusive." Bowman, supra, 220 F.3d at 462. "Appropriate factors for the court to consider when determining whether conduct is severe or persuasive enough to constitute a hostile work environment 'include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Id. quoting Harris, 510 U.S. at 23.

In this case, Chloe Foods contends Plaintiff cannot show the allegedly harassing conduct was so pervasive or severe as to alter the conditions of her employment. In this regard, Chloe Foods does a good job of separating out the incidents and points out that many of the comments or actions were not solicitations for sex or sexual harassment, although Plaintiff may have construed them as such. For example, Chloe Foods asserts there was nothing wrong with Stachler's invitation to his home and "a reasonable person would not find Mr. Stachler's invitation to his home (also his office) so they could get to know each other before their first business trip to be inappropriate or offensive." (Docket Entry No. 31 at 8). Similarly, Chloe Foods finds nothing wrong regarding Stachler's comments about visiting an adult book store since "[t]wo adults having a discussion about adult toy stores after passing such a store on the expressway does not rise to the level of actionable harassment because it is neither severe or pervasive." (Id..) Chloe Foods also posits there was nothing wrong about Stachler telling Plaintiff on their business trips that he would come to her room if invited since the "statements are not vulgar or intimidating, but rather nothing more than an inquiry as to whether Plaintiff was willing to invite him to her room." (Id. at 9). Chloe Foods does characterizes the casino incidents as inappropriate, but claims the physical contact was not pervasive or severe, and Plaintiff did not report the offensive conduct.

9

While Stachler's conduct, viewed individually and in the abstract, may not be seen as creating a hostile work environment, this Court is to look at the totality of the circumstances in determining whether sufficient evidence exists to warrant a jury trial. The Court is not to disaggregate the incidents by "divid[ing] and categoriz[ing]" them because to do so "divorc[es] them from their context and depriv[es] them of their full force." Williams, supra 187 F.3d at 562. This is because "when the complaints are broken into their theoretical component parts, each claim is more easily dismissed." Id. Instead, "the totality-of-circumstances test must be construed to mean that even where individual instances of sexual harassment do not on their own create a hostile environment, the accumulated effect of such incidents may result in a Title VII violation." Id. at 563.

"[M]indful of the need to review the work environment as a whole, rather than focusing single-mindedly on individual acts of alleged hostility," id., this Court concludes a rationale jury could determine Plaintiff was subjected to a hostile work environment or, at the very least, Plaintiff's allegations raise questions of fact for the jury. First, it must be understood that both Plaintiff and Stachler worked out of their homes and Plaintiff's work consisted of calling on managers of national chain restaurants or food brokers to obtain appointments so that a representative of Chloe foods could try to sell them its food products. Her job required her to be in contact with Stachler, her supervisor, on a frequent basis. If Plaintiff is believed, a reasonable jury could find that, from the very first phone call, Stachler's interest in Plaintiff was not purely business oriented. He invited her to his home for the weekend and sent her a picture of him standing next to his Porsche. During his first actual encounter with Plaintiff, Stachler asked if he was as good looking as in his picture and while driving to Louisville asked Plaintiff about her preferences in sex toys and her interest in visiting an adult book store. Whenever Plaintiff communicated with Stachler, which was regularly and sometimes daily, she alleges Stachler always managed to veer the conversation towards sex. Other than contacting potential buyers and brokers of Chloe food products, Plaintiff's work environment was her communication and contact with Stachler, who directed and supervised her activities. In other words, her work environment was primarily determined by her relationship with Stachler.

10

Although Plaintiff was not very specific about the alleged comments and occasions, she did testify that Stachler offered to meet Plaintiff in her hotel room if invited and he made clear in continuing suggestive statements that he wanted to have a sexual relationship with her. Stachler also physically assaulted, or attempted to physically assault, Plaintiff at a casino on at least three occasions during one night when he was attempting to kiss her. All of these events took place in a compressed time frame of nine weeks.

Separately, each incident might not be considered to be severe and pervasive. However, when combined it is clear that sufficient facts have been submitted which could support a jury's verdict that Plaintiff was subjected to a hostile work environment. See, Bakersville, supra, 50 F.3d at 431 (there is no bright line "between a merely unpleasant working environment . . . and a hostile or deeply repugnant one . . . ; and when it is uncertain on which side the defendant's conduct lies, the jury's verdict, whether for or against the defendant, cannot be set aside in the absence of trial error"). Summary judgment will not be granted to Chloe Foods on Plaintiff's hostile work environment claim.

### 2. Retaliation

Plaintiff claims that she was retaliated against when, a mere three days after telling Stachler they needed to maintain a professional relationship, she was fired. In order to establish a *prima facie* case of retaliation, Plaintiff must show: (1) she engaged in protected activity; (2) this exercise of protected rights was known to defendant; (3) defendant thereafter took adverse employment action against the plaintiff, and (4) there was a causal connection between the protected activity and the adverse employment action. Morris v. Oldham County Fiscal Court, 201 F.3d 784, 791 (6th Cir. 2000). "If and when a plaintiff has established a *prima facie* case, the burden of production of evidence shifts to the employer to 'articulate some legitimate, nondiscriminatory reason' for its actions." Id. at 792-93 (citation omitted). "The plaintiff, who bears the burden of persuasion throughout the entire process, then must demonstrate 'that the proffered reason was not the true reason for the employment decision.'" Id. at 793 (citation omitted).

11

In this case, Chloe Foods claims Plaintiff cannot establish either the second or fourth elements of a *prima facie* case. Chloe Foods first argues Plaintiff cannot show Chloe Foods was aware of any alleged harassment, let alone protected activity, since Plaintiff never complained to corporate headquarters or the Human Resources Department, and since Siegel was the one who made the decision to terminate Plaintiff. This argument neglects to consider that Plaintiff claims she was never given any information on how to address harassment and it is unclear whether Chloe Foods even had a sexual harassment policy when Plaintiff was employed there. It also neglects to consider that Stachler was Plaintiff's supervisor and he allegedly prohibited Plaintiff from talking to anyone but him at Chloe Foods. It also ignores evidence which suggests Stachler participated in several phone calls on the day of Plaintiff's termination during which he, Siegel, and Loeb discussed Plaintiff's future with the company. Those phone calls occurred only three days after Plaintiff told Stachler their relationship needed to be strictly professional. Insofar as Stachler may have had an influence on the termination of Plaintiff's employment, the Court will not grant summary judgment based on Chloe Foods' assertion the company was unaware Plaintiff had been subjected to harassment or engaged in protected activity by voicing her opposition. See, Frazier v. USF Holland, Inc., 2007 WL 2913880 at *5 (6th Cir. 2007) ("the decisionmaker's knowledge of the protected activity is an essential element of the *prima facie* case of unlawful retaliation"); Proffit v. Metropolitan Gov't. of Nashville, 150 Fed. Appx. 439, 442 (6th Cir. 2005)("plaintiff may survive summary judgment by producing circumstantial evidence" that decisionmakers were aware of her protected activity). This is particularly true since "[t]he burden of establishing a *prima facie* case of retaliation is not onerous, but one easily met." Nguyen v. City of Cleveland, 229 F.3d 559, 563 (6th Cir. 2000).

Chloe Foods also asserts that Plaintiff cannot establish a causal link between her admonition to Stachler and her subsequent termination because Plaintiff was fired for poor performance. However, "evidence that . . . the adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation." Id. Here, Plaintiff was fired only three days after telling

12

Stachler (once again) that she was not interested in anything but a business relationship with him. The Court concludes there is sufficient indirect evidence of a casual connection between her admonition to Stachler and her firing so as to create an inference of retaliatory motive, particularly since up until that point Plaintiff apparently had not been the subject of any disciplinary action or serious complaints about her work activities.  See, Bainbridge v. Loffredo Gardens, Inc., 378 F.3d 756, 761 (8th Cir. 2004)(more than a temporal connection between the protected activity and the adverse employment action must exist and jury question was presented where, shortly after complaint, employee was terminated even though before then he had no extensive disciplinary record).

   With this conclusion, there remains the question of whether Chloe Foods has forwarded a legitimate non-discriminatory reason for its actions and, if so, whether Plaintiff can show this stated reason is pretext.  Chloe Foods states its reason for termination had nothing to do with whatever situation there was with Stachler.  Instead, it claims that, contrary to representations made at the hiring interview, Plaintiff was unable to land an appointment for Chloe Foods to make a presentation with a restaurant chain.  Maybe that is the real reason, but it is a question which the jury must decide. According to Plaintiff, she was not provided ample opportunity to complete her goals and her efforts were hampered after her job duties were changed when she did not go along with Stachler's overtures during their first trip to Louisville.  Given that Plaintiff was never counseled about her performance, Chloe Foods will have to present its reasons for termination to a jury for it to determine whether it was the real reason or, instead, pretextual.  Accordingly, summary judgment will not be granted to Chloe Foods on Plaintiff's retaliation claim.

## B.  Common Law Claims

   Plaintiff's common law claims against Chloe Foods are all based upon her assertion that, as Stachler's employer, Chloe Foods is vicariously liable for his actions.  "[A]n employer may be held liable for the torts committed by his or her employees while performing duties within the scope of employment."  White v. Revco Discount Drug Ctrs., Inc., 33 S.W.3d 713, 718 (Tenn. 2000).  As a

13

general proposition, whether an employee is acting with the scope of his or her employment is for the trier of fact. Morris v. Collis Foods, Inc., 2002 WL 1249514 at *3 (Tenn. Ct. App. 1990)(collecting cases). However, where the facts are undisputed and do not support a conflicting conclusion, scope of employment may be determined as a matter of law. Id.

"In order to hold an employer liable, the plaintiff must prove (1) that the person who caused the injury was an employee, (2) that the employee was acting on the employer's business, and (3) that the employee was acting within the scope of his employment when the injury occurred." Tennessee Farmers Mut. Ins. Co. v. American Mut. Liability Ins. Co., 840 S.W.2d 933, 938 (Tenn. Ct. App. 1992). Tennessee courts often utilize the Restatement (Second) of Agency as a framework for determining whether an employee's acts are within the scope of employment. Id. So far as relevant, the Restatement provides:

> (1) Conduct of a servant is within the scope of employment if, but only if:
>     (a) it is of the kind he is employed to perform;
>     (b) it occurs substantially within the authorized time and space limits;
>     (c) it is actuated, at least in part, by a purpose to serve the master; and
>     (d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.
>
> (2) Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time and space limits, or too little actuated by a purpose to serve the master.

Restatement (Second) of Agency § 228 (1957).

Application of those principles to the facts of this case lead this Court to conclude that Chloe Foods is not vicariously liable for the alleged assault and battery by Stachler since that occurred on a trip to a casino. While it is true that the overall trip to Louisville was to meet with brokers, the detour to the casino occurred after Plaintiff and Stachler had completed their job duties for the day and were in a social setting. Chloe Foods did not explicitly or even implicitly authorize the jaunt to the casino and the eating, drinking and gambling at the casino was not in any way designed to serve Chloe Foods. Further, the force allegedly used by Stachler was intentional and not expected by Chloe Foods.

Whether Stachler may be said to have been acting within the scope of his employment in relation to the remainder of Plaintiff's common law claims is a more difficult question because the allegations are wide-ranging and not limited to the social trip to the casino. That question can be left unanswered because there are other reasons which lead this Court to conclude that the other state law claims asserted by Plaintiff should be dismissed as to Chloe Foods.

Plaintiff sues Chloe Foods for outrageous conduct and the intentional infliction of emotional distress. In Tennessee, "[o]utrageous conduct and intentional infliction of emotional distress are different names for the same cause of action" and hence "the two names are used interchangeably." Nairon v. Holland, 2007 WL 626953 at *4, n. 1 (Tenn. Ct. App. 2007). The tort of outrageous conduct in Tennessee exists only where (1) the conduct of the defendants has been so outrageous in character, and so extreme in degree, as to be beyond the pale of decency, and to be regarded as atrocious and utterly intolerable in a civilized society, and (2) the conduct results in serious mental injury. Swallows v. Western Elec. Co., 543 S.W.2d 581, 582-83 (Tenn. Ct. 1976). "Generally, 'the case involves facts which would arouse the resentment of an average member of the community and lead him to exclaim, "Outrageous!" Sayer v. Memphis Educ. Ass'n, 2006 WL 3298326 at *6 (Tenn. Ct. App. 2006) quoting, Chandler v. Prudential Ins. Co., 715 S.W.2d 615, 622 (Tenn. Ct. App. 1986). Hence, it is not sufficient that a defendant "has acted with an intent which is tortious or even criminal, or that he had intended to inflict emotional distress." Bain v. Wells, 936 S.W.2d 618, 622 (Tenn. 1997).

Cases finding outrageous conduct involve conduct which is much more egregious than that which occurred here. See, Johnson v. Woman's Hospital, 527 S.W.2d 133 (Tenn. Ct. App. 1975)(mother being shown her deceased baby preserved in formaldehyde in a jar); Dunbar v. Strimas, 632 S.W.2d 558 (Tenn. Ct. App. 1981)(mother being erroneously informed her daughter's death was the result of sexual assault and suffocation); Dunn v. MotoPhoto, Inc., 828 S.W.2d 747 (Tenn. Ct. App.1991)(photo store employee informing a woman that her film could not be developed when in fact the employee kept the nude photographs and showed them to acquaintances of the

15

customer).  The facts alleged by Plaintiff, even if true, do not rise to this level or constitute such extreme, outrageous conduct which would be beyond the pale of decency.  The facts are, unfortunately, not atypical of the fact pattern presented in most harassment cases and "discriminatory conduct does not automatically give rise to the imposition of liability for the intentional infliction of emotional distress."  Arnett v. Domino's Pizza I, 124 S.W.3d 529, 540 (Tenn. Ct. App. 2003). Further, Plaintiff has not established the type of serious mental injury as a result of Stachler's alleged conduct that is required to prove intentional infliction of emotional distress.  Accordingly, the intentional infliction of emotional distress/outrageous conduct claim will be dismissed.

Plaintiff also seeks to hold Chloe Foods liable for the negligent infliction of emotional distress.  The Tennessee Supreme Court adopted a general negligence approach for a plaintiff to establish a negligent infliction of emotional distress claim, meaning plaintiff must show breach of duty, injury or loss, causation in fact and proximate or legal cause.  Camper v. Minor, 915 S.W.2d 437, 446 (Tenn. 1996).

Here, Chloe Foods initially asserts it had no duty to Plaintiff because it has an anti-harassment policy.  The problem with this argument is that the record does not clearly show that such a policy was actually in effect at the relevant period in this case and, moreover, there is no evidence that Plaintiff was informed about such a policy, even though she had been sent to training for several days at corporate headquarters.

Apart from arguing no duty, Chloe Foods asserts Plaintiff has provided insufficient evidence to support her claimed emotional distress.  In Camper, the Tennessee Supreme Court held that recovery for the negligent infliction of emotional distress is only appropriate for "serious" or "severe" emotional injury which, in the absence of corresponding physical injury, is established by expert medical or scientific proof.  Id.  This requirement was imposed in order to ferret out trivialized claims. However, subsequent Tennessee Supreme Court opinions have indicated that such expert medical or scientific proof is necessary in "'stand-alone' emotional distress claims" and not necessarily  in cases "when the emotional injury damages is one of multiple claims for damages."

16

Estate of Amos v. Vanderbilt Univ., 62 S.W.3d 133, 135 (Tenn. 2001). Most often, the emotional distress claim is "parasitic" to claims for a corresponding physical injury. See, Flax. v. Daimler Chrysler Corp., 2006 WL 3813655 at ** 9-10 (Tenn. Ct. App. 2006)(collecting cases). Regardless, Camper and its progeny require "severe" or "serious" emotional injury to support a negligent infliction of emotional distress claim.

In this case, Plaintiff vaguely asserted in her Complaint that she suffered severe emotional distress. In a Declaration submitted in opposition to the Motions for Summary Judgment, Plaintiff claims that she "frequently" thinks about how she was treated while employed by Chloe Foods and that "[a]s a direct result of this treatment and termination" she "continue[s] to have frequent nightmares" and "suffer[s] from loss of sleep and/or insomnia." (Briordy Decl. ¶¶ 3 & 4). Admittedly, however, Plaintiff did not seek out medical care in relation to her claimed emotional distress, nor has she been prescribed or taken any medication for any alleged emotional condition.

In the Court's view, Plaintiff has presented insufficient evidence of a severe or serious emotional injury so as to present a jury question on her claim for the negligent infliction of emotional distress. Several Tennessee cases have addressed similar factual situations and determined summary judgment to be appropriate.

For example, in Dodson v. St. Thomas Hosp., 2005 WL 819725 (Tenn. Ct. App. 2005), plaintiff, a former hospital employee, filed suit claiming that as a result of her termination she suffered "extreme emotional distress and humiliation." Id. at *3. However, plaintiff suffered no physical injury and offered no expert medical or scientific proof to support her negligent infliction of emotional distress claim. Summary judgment was therefore granted on that claim and affirmed on appeal.

In Oates v. Chattanooga Pub. Co., 205 S.W.3d 418 (Tenn. Ct. App. 2006), plaintiff sued her former employer alleging handicap discrimination and a hostile work environment. Additionally, she claimed that the defendant's action caused the negligent infliction of emotional distress. However, plaintiff did not receive any counseling or treatment for her alleged emotional distress,

17

prompting the trial court to determine that the record was devoid of any evidence of serious mental injury. On appeal, plaintiff challenged the ruling, claiming that it was a disputed issue as to whether the alleged harassment was severe enough to allow for recovery on a claim for the negligent infliction of emotional distress. The Tennessee Court of Appeals disagreed, noting that "i[f] there is no serious emotional injury, then it is irrelevant whether or not the alleged conduct is severe enough to be deemed negligent or even outrageous." Id. at 429.

Like the plaintiffs in Dodson and Oates, Plaintiff has failed to present sufficient evidence of a "severe" or "serious" emotional injury so as to present a jury question on her negligent infliction of emotional distress claim. Accordingly, Chloe Foods will be granted summary judgment on this claim.

## IV. STACHLER'S MOTION FOR SUMMARY JUDGMENT

Plaintiff brings several claims against Stachler. These include a claim for retaliation under the THRA, aiding and abetting a violation of the THRA, intentional infliction of emotional distress/outrageous conduct, negligent infliction of emotional distress, and assault and battery. For the reasons already explained in the discussion regarding Chloe Foods' Motion for Summary Judgment, the Court will grant summary judgment in favor of Stachler on Plaintiff's claims for the intentional infliction of emotional distress/outrageous conduct and the negligent infliction of emotional distress. This leaves for consideration Plaintiff's claims for retaliation under the THRA, aiding and abetting a violation of the THRA, and assault and battery.

### A. Individual Liability Under the THRA

Plaintiff seeks to hold Stachler personally liable for retaliation and for aiding and abetting retaliation. Stachler first notes that, as a general rule, the THRA, like Tile VII, does not allow for the imposition of personal liability because an individual is not an employer. However, that argument neglects to consider T.C.A. § 4-21-301(1) which makes it unlawful for "a person" to "[r]etaliate or discriminate in any manner against a person because such person has opposed a practice declared discriminatory by this chapter." An individual can be liable for retaliation under

18

this statute, <u>Emerson v. Oak Ridge Research, Inc.</u>, 187 S.W.3d 364, 377 (Tenn. Ct. App. 2005). Plaintiff has forwarded sufficient evidence from which a jury could determine she was retaliated against by Stachler, including the change in job duties after the first trip to Louisville and her termination a mere three days after complaining (once again) that she wanted her relationship with Stachler to be strictly professional. While Stachler claims he never sexually harassed her and thus could not be liable for retaliation, it will be for the jury to determine credibility.

With regard to aiding and abetting retaliation, the THRA provides that "[i]t is a discriminatory practice for a person . . . to . . . (2) [a]id, abet, incite, compel or command a person to engage in any of the acts or practices declared discriminatory by this chapter." T.C.A. § 4-21-301(2). Under that statute, "individual liability may exist under the common law civil liability of aiding and abetting." <u>Smith v. City of Chattanooga</u>, 2007 WL 4374039 at *8 (Tenn. Ct. App. 2007). "The common law civil liability theory of aiding and abetting requires that 'the defendant knew that his companions' conduct constituted a breach of duty, and that he gave substantial assistance or encouragement to them in their acts.'" <u>Id</u>. (citation omitted).

When the facts and inferences to be derived therefrom are construed in Plaintiff's favor, Plaintiff has presented evidence from which a jury could conclude that Stachler should be held personally liable for aiding and abetting the alleged retaliation and/or termination. Her evidence is not merely that Stachler sexually harassed her and engaged in retaliatory conduct. To the contrary, she has presented evidence (such as Stachler's prohibiting Plaintiff from talking to anyone at Chloe Foods but him, and the three telephone calls in which he participated which led to Plaintiff's termination) from which a jury could conclude that he thwarted Plaintiff's ability to complain and then actively participated in retaliatory conversations which led to Plaintiff's termination. This presents a jury question since, under Tennessee law, an individual may be liable where he is a supervisor and encourages or prevents the employer from taking corrective action. <u>See</u>, <u>Harris v. Dalton</u>, 2001 WL 422964 (Tenn. Ct. App. 2001)(judgment in favor of supervisor not warranted where evidence taken in plaintiff's favor showed supervisor denied plaintiff's claims of harassment and urged employer to "get rid" of plaintiff); <u>Steele</u>

19

v. Superior Home Health Care of Chattanooga, Inc., 1998 WL 783348 at *8 (Tenn. Ct. App. 1998)(judgment in favor of supervisor not warranted where supervisor denied conduct which was designed to cover up his actual conduct and discourage employer from taking action to remedy situation).

### B. Assault and Battery

Stachler also claims he is entitled to summary judgment on Plaintiff's assault and battery claims. He points out that the physical contact directed at Plaintiff did not suggest any violence or brutality.

"The elements of a civil claim for assault are derived from the Tennessee common law." Chidester v. Thomas, 2006 WL 1459578 at *4 (W.D. Tenn. 2006). "Under the common law, an assault is 'any act tending to do corporal injury to another, accompanied with such circumstances as denote at the time an intention, coupled with the present ability, of actual violence against that person." Id. (citation omitted). The court in Chidester also observed that "a plaintiff does not have to show that he was put in apprehension to establish a claim for assault under Tennessee common law." Id.

Grabbing another person without permission can constitute an assault, see, Wells v. J.C. Penney Co., 2002 WL 31288979 at *4 (Tenn. Ct. App. 2002), as can unwanted hugging and kissing, see, Baltrip v. Norris, 23 S.W. 336, 338 (Tenn. Ct. App. 2000). Clearly, if Plaintiff's version of events is believed, a reasonable jury could conclude that she was subjected to assault during Stachler's advances at the casino.

Based upon the events at the casino, a reasonable jury could also find that Plaintiff was subjected to battery by Stachler. "A 'battery' is 'any intentional, unlawful and harmful (or offensive) contact by one person with the person of another.'" Thompson v. Williamson Cty., 965 F.Supp. 1026, 1038 (M.D. Tenn. 1997). Stated slightly differently, "[a] battery is an intentional act that causes an unpermitted, harmful or offensive bodily contact." Doe v. Mama Taori's Premium Pizza, LLC, 2001 WL 327906 at *4 (Tenn. Ct. App. 2001).

In this case, Plaintiff claims Stachler's grabbing her and kissing or attempting to kiss her was unwanted and she told him to stop but he did not. A reasonable jury could reach the conclusion that

20

Stachler's actions were intentional, offensive and without Plaintiff's permission.  Hence, summary judgment is unwarranted on the battery claim against Stachler.

## V. <u>CONCLUSION</u>

On the basis of the foregoing, the Court will grant in part and deny in part Defendant Chloe Foods Corporation's Motion for Summary Judgment (Docket Entry No. 29).  The Court will grant that Motion with respect to Plaintiff's claims for assault, battery, the intentional infliction of emotional distress/outrageous conduct, and the negligent infliction of emotional distress.  The Court will deny the Motion with respect to Plaintiff's claims under Title VII and the THRA for a hostile work environment and retaliation.

The Court will also grant in part and deny in part Defendant Steve Stachler's Motion for Summary Judgment (Docket Entry No. 33).  The Court will grant that Motion with respect to Plaintiff's claims against Stachler for the intentional infliction of emotional distress/outrageous conduct and the negligent infliction of emotional distress.  The Court will deny the Motion with respect to Plaintiff's claims under the THRA for retaliation or aiding and abetting retaliation, and Plaintiff's common law claims for assault and battery.[6]

An appropriate Order will be entered.

_____
ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE

_____

[6]The Court notes that in Section XI of the Complaint, Plaintiff claims that the wrongful acts of the Defendants entitle her to an award of punitive damages.  While Defendants are correct that there can be no self-standing claim for punitive damages, Plaintiff's allegations are that Defendant's conduct was egregious enough to allow an award of punitive damages.  Even though many of the claims against Defendants will be dismissed, there remains claims against each Defendant which would allow for the imposition of punitive damages, including the Title VII claim for retaliation against Chloe Foods,  <u>see</u>, <u>Tisdale v. Federal Exp. Corp.</u>, 415 F.3d 516, 533 (6th Cir. 2005)(jury should decide whether employer engaged in a good faith effort to comply with Title VII in deciding whether punitive damages were warranted), and the assault and battery claim against Stachler, <u>see</u>, <u>Shockley v. Crosby</u>, 2004 WL 2113052 at *12 (Tenn. Ct. App. 2004)(jury may award punitive damages for assault and battery where award is made for actual damages).  Thus, the Court will not dismiss Plaintiff's "claim" for punitive damages.

21